**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

———————————————————————————————————————

ALLMERICA FINANCIAL BENEFIT    )
INSURANCE CO. and    )
MASSACHUSETTS BAY INSURANCE CO.,    )
    )
       Plaintiffs,    )
    )
v.    )    Civil Action No.
    )    2:17-cv-02545
EAGLE SALES COMPANY, INC.,    )
JAMES LOWERY and SHERRY SANDERS,    )
as parents and next of kin of REED G. LOWERY,    )
deceased, WILLIAM BLAKE KOBECK,    )
WILLIAM MARK KOBECK, KIMBERLY    )
KOBECK, CAROLYN KOBECK, and    )
CLAY & LAND INSURANCE, INC.,    )
    )
       Defendants.    )

———————————————————————————————————————

**ORDER GRANTING IN PART, DENYING IN PART PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

**ORDER GRANTING IN PART, DENYING IN PART, DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

———————————————————————————————————————

Before the Court is the Motion for Summary Judgment filed by Defendants James Lowery

and Sherry Sanders ("Lowery Defendants") (ECF No. 176) on May 11, 2020 and unopposed by

Defendants Eagle Sales Company, Inc. ("Eagle Sales"), William Blake Kobeck ("Blake"), William

Mark Kobeck ("Mark Kobeck"), Kimberly Kobeck ("Kimberly"), and Carolyn Kobeck (Carolyn)

(collectively, "Eagle Sales Defendants") on July 2, 2020[1] (ECF No. 188).  Also before the Court

---

[1] The July 2, 2020 Response to Lowery Defendants' Motion for Summary Judgment states that Eagle Sales and the
Kobeck Family have no opposition to the motion and that there is a mutuality of interest between them and the
Lowery Defendants.  For purposes of this Order, "Defendants" will hereby refer collectively to the Lowery
Defendants, Eagle Sales, and the Kobeck Family, but not Clay & Land Insurance, Inc.

is the Motion for Summary Judgment filed by Plaintiffs Allmerica Financial Benefit Insurance Co. ("Allmerica") and Massachusetts Bay Insurance Co. ("Mass Bay") (collectively, "Plaintiffs") on May 11, 2020. (ECF No. 177.) Clay & Land opposes both Defendants' and Plaintiffs' motions for summary judgment. (ECF No. 186.)

For the reasons discussed below, the motions are **GRANTED IN PART** and **DENIED IN PART**.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

a.  **The Accident**

This case arises out of a fatal automobile accident on May 9, 2017 in Fayette County, Tennessee. ("Second Amended Complaint", ECF No. 70 ¶ 15.) At the time of the accident, William Blake Kobeck ("Blake"), the son of Defendant William Mark Kobeck ("Mark Kobeck"), was driving a 2014 Cadillac CTS-V with Reed G. Lowery, son of Lowery Defendants, in the passenger seat. (Id.) The accident resulted in the death of Reed Lowery. (Id.) Following the accident, Plaintiffs sent letters indicating that there may be no coverage under either of Eagle Sales' insurance policies for injuries sustained in the crash. (ECF No. 190-1 ¶ 58.) Furthermore, the Lowery Defendants filed a tort action against Eagle Sales in the Circuit Court of Tennessee in Somerville, alleging that its principals are directly liable for the death of Reed Lowery due to their negligent entrustment of the vehicle to Blake and their failure to supervise Blake in preventing him from accessing the vehicle. (ECF No. 90-1 ¶ 3; "State Court Complaint", ECF No. 176-11.) The State Court Complaint puts at issue the coverage provisions of two insurance policies issued by Plaintiffs to Eagle Sales. Specifically, the issue before this Court is whether the provisions of those two policies extend coverage to damages caused by the accident. The Plaintiffs bring this action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, "seeking an interpretation of

insurance contracts entered into between Plaintiffs and Eagles Sales Company, Inc. in the State of Tennessee."  (ECF No. 70 ¶ 9.)

**b.  The Issuance of the Policies**

Mark Kobeck is the vice president of Eagle Sales, and has sole discretion with respect to insurance policies on its behalf.  (ECF No. 187 ¶ 8.)  Michael Henry ("Henry") is the executive vice-president of Clay & Land Insurance, Inc. ("Clay & Land"), with over thirty years of experience as an insurance agent.  (ECF No. 70 ¶ 26.)  Plaintiffs retained Clay & Land—a brokerage firm representing 280 insurance carriers—to serve as their insurance agent in negotiations, discussions, and procurement of insurance coverage with potential and current policyholders at all times relevant to this matter.  (Id. ¶ 25; ECF No. 187 ¶¶ 13–14.)  Through Clay & Land, Henry sold two insurance policies to Eagle Sales for a 2014 Cadillac CTS-V ("Cadillac") for which Mark Kobeck was the title owner:  1) Policy No. AW5 A945276 issued by Allmerica to Eagle Sales for June 1, 2016 through June 1, 2017 (ECF No. 70-2)[2] ("Allmerica Policy"); and 2) Policy No. OD5 A945105 issued by Mass Bay to Eagle Sales ("Mass Bay Policy") (collectively, "Hanover Policies") for June 1, 2016 through June 1, 2017.  (ECF Nos. 190-1 ¶ 4; 198 ¶ 24; ECF No. 70 ¶¶ 12–13.)

Prior to the issuance of these policies, Eagle Sales and the Kobeck family were insured by State Farm Insurance ("State Farm Policy").  (ECF No. 190-1 ¶ 36.)  Henry was provided a copy of the State Farm Policy, and Mark Kobeck informed him that he was willing to change insurance companies and purchase a policy through Clay & Land as long as he retained the same coverage as under his existing State Farm Policy.  (Id.)  In negotiations between the parties, Mark Kobeck emphasized that his company, Eagle Sales, wanted to acquire similar or better coverage for a

---

[2] Plaintiffs have attached a copy of the issued policy to the Second Amended Complaint.  Eagle Sales disputes that this version of the policy was the one delivered to Mark Kobeck.  (ECF No. 190-1 ¶ 38.)

reduction in the cost of his commercial liability insurance premiums.  (Id. ¶ 35.)  Prior to Eagle Sales' purchase of the insurance policies, Mark Kobeck informed Clay & Land that the Cadillac would be partially used for business purposes and partially be used for personal/non-business purposes.  (Id. ¶ 11.)  A quote summary generated by the Hanover Insurance Group ("Hanover")[3] indicates that the listed "vehicle use" for the Cadillac was "pleasure".  (Id. ¶ 10.)

Before the switch, Blake was a covered driver under the State Farm Policy.  (ECF No. 190-1 ¶ 37.)  Blake had been an employee of Eagle Sales since he turned fifteen, including the entire year before the accident.  (ECF No. 187 ¶ 11.)  Mark Kobeck asserts that he made clear to Clay & Land that Blake would need to continue to be covered under any new policy.  (ECF No. 190-1 ¶ 37.)  Mark Kobeck also asserts that he "could not allow for coverage to be less than the coverage Eagle Sales had with" its State Farm Policy.  (Id. ¶¶ 36–37.)  Henry offered Mark Kobeck a policy that would save him money compared to his State Farm Policy, and on June 1, 2016, the policy went into effect.  (Id. ¶¶ 35, 38.)  Mark Kobeck was provided a copy of this policy after it went into effect.  (Id. ¶ 38.)

### c.  The Exclusion of Named Driver Endorsement

Plaintiffs assert that the copy provided after issuance of the policy would have included the "Exclusion of Named Driver" endorsement (the "Exclusion"), but Mark Kobeck alleges that when the policy was delivered, it included approximately 423 pages and did not have the Exclusion.  (ECF No. 187 ¶ 45.)  There is no signed copy of the Exclusion.  The parties dispute when Mark Kobeck and Kaye Waldo, an account manager for Eagle Sales, first became aware of the Exclusion.  (Id. ¶ 46.)  Mark Kobeck asserts that he first learned from Henry that Hanover was attempting to exclude certain individuals from coverage around the effective date of the Allmerica

---

[3] Allmerica and Mass Bay are part of the Hanover Insurance Group.

Policy, and that he told Henry that this would not be acceptable.  (ECF No. 190-1 ¶ 40.)  Mark Kobeck further alleges that if these excluded individuals were not covered, Eagle Sales would not accept Hanover's insurance and would not be able to switch from State Farm.  (Id. ¶ 41.)  Of the drivers supposed to be excluded, three were branch managers who drove trucks home at the end of the day, and one was Mark Kobeck's son, Blake.  (Id. ¶ 42.)  Mark Kobeck asserts that when he first learned of the attempted exclusion of these drivers, Henry asked him to obtain documentation of the records of each person.  He contends that after he provided this documentation, Henry informed him that "everything is taken care of; we're all good", which he took to mean that Blake would not be excluded from the policy.  (Id. ¶ 43.)

The assurances allegedly made by Henry and the reliance on them are key factual disputes in this case.  (See, e.g., ECF No. 190-1 ¶¶ 43–49; ECF No. 187 ¶¶ 46–52.)  Henry states that he left it up to Mark Kobeck to get the exclusion corrected, that Mark Kobeck never followed up regarding the exclusion, and that he never told Mark Kobeck that Blake was an included driver at any time from inception of the Hanover Policies through the date of the accident.  (ECF No. 187, ¶¶ 46–49.)  Mark Kobeck asserts that he relied on Henry's assurances, and took this to mean that Blake would be covered by the Hanover Policies and permitted to drive.  (ECF No. 190-1, ¶ 45.)  The parties also dispute whether Eagle Sales' accounting manager, Kaye Waldo ("Waldo"), was aware of the Exclusion.  Plaintiffs allege that neither Mark Kobeck nor Kaye Waldo ever saw a list of approved drivers that included Blake, while Waldo testified that she was in Mark Kobeck's office when Henry provided assurances on behalf of Eagle Sales that there was coverage for Blake under the Hanover Policies.  (ECF Nos. 187 ¶ 48, 190-1 ¶ 49.)

Plaintiffs dispute the relevance of the underlying basis for Blake's initial exclusion from the Hanover Policies.  Defendants argue that Hanover wanted to exclude Blake because of an

erroneous belief that his license was suspended for an alleged failure to pay a speeding ticket sometime between 2012–2013. (ECF No. 190-1 ¶ 50.) Plaintiffs do not dispute that Mark Kobeck informed Henry of mistakes on Blake's motor vehicle record ("MVR"), and that he testified that it was his understanding that Blake was excluded due to a suspended license appearing on his MVR. (Id. at Response.) Furthermore, Henry admits that the legal matter was resolved in 2013, that Blake had a valid license for all times subsequent to the incident, and that Mark Kobeck told him about the incident and that the issue had been cleared. (Id. ¶¶ 51–52.) Beyond this, the parties' dispute what assurances were made by Henry, what follow-ups were conducted by either Mark Kobeck or Henry, and what influence or knowledge Henry—as opposed to the policy underwriter, Tonya Hunter, and claims adjuster, Shelly Gorcica—had over the exclusion of Blake from the policy. (ECF Nos. 190-1 ¶¶ 58–65, 187 ¶¶ 27–31, 51–55.) *After* the accident, Shelly Gorcica ("Gorcica"), a claims adjuster for Hannover, sent letters indicating there may no coverage under the Hanover Policies and told Henry that Blake would be excluded for being under the age of 25. (ECF No. 190-1 ¶ 58.) Henry does not appear to have been aware of this exclusion, and hinted that Hanover may have been changing their stated rationale for denying coverage to Blake, but Plaintiffs argue that even if true, this is immaterial because he is not in charge of decisions regarding exclusions and coverage. (Id. ¶¶ 61–64.)

### d. The Allmerica Policy

The Allmerica Policy was issued to Eagle Sales for the period of June 1, 2016 through June 1, 2017. (ECF No. 70-2.) Although the vehicle was personally owned by Mark Kobeck, it was listed on a commercial policy, and it is undisputed that Mark Kobeck indicated to Hanover adjuster Rick Hein that Eagle Sales was the owner of the Cadillac. (ECF No. 187 ¶ 33.) The Allmerica Policy covers "all sums an 'insured' legally must pay as damages because of 'bodily injury' or

'property damage' to which this insurance applies, caused by an 'accident' resulting from the ownership, maintenance or use of a covered 'auto.'"  (ECF No. 70-2 at PageID 1064.)  The parties do not dispute that the Cadillac is a covered auto under the policy, but they do dispute the interpretation of "who" in Section II(A)(1) of the Business Auto Coverage provisions of the Allmerica policy, which provides as follows:

1. Who is An Insured

    The following are "insureds":

    a.  You for any covered "auto".

    b.  Anyone else while using with your permission a covered "auto" you own, hire, or borrow except:

        (1) The owner or anyone else from whom you hire or borrow a covered "auto".  This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.
        (2) Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.
        (3) Someone using the covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.
        (4) Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".
        (5) A partner (if you are a partnership), or a member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her own household.

    c.  Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

ECF No. 70-2 at PageID 1064.

The Allmerica Policy also includes a "Business Auto Coverage Broadening Endorsement" ("Broadening Endorsement").  (ECF No. 70-2 at PageID 1095.)  The relevant section of the Broadening Endorsement provides as follows:

4. EMPLOYEES AS INSUREDS

The following is added to the SECTION II – LIABILITY COVERAGE, Paragraph 1. Who Is An Insured provision:

e. Any employee of yours is an 'insured' while using a covered 'auto' you do not own, hire or borrow in your business or your personal affairs.

ECF No. 70-2 at PageID 1096.

**e.  The Mass Bay Policy**

The Mass Bay Policy was issued to Eagle Sales for the period of June 1, 2016 to June 1, 2017. (ECF No. 70-3.)  It includes both "Businessowners Coverage" and "Commercial Umbrella" coverage provisions, and does not include an excluded driver endorsement.  (ECF No. 70-3.) Section II(B) of the Businessowner Coverage provisions provides exclusions to coverage.  Of note, section II(B)(1)(g) recites:

> 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and 'loading or unloading'.  This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the 'occurrence' which caused the 'bodily injury' or 'property damage' involved the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft that is owned or operated by or rented or loaned to any insured.

ECF No. 70-3 at PageID 1223.

The Mass Bay Policy also includes "Commercial Umbrella" coverage ("Umbrella Coverage").  Of note, it includes an "Amendatory Endorsement" section which "changes the policy." (Id. at PageID 1377.)  The Umbrella Coverage includes a section that provides conditions pertaining to "Other Insurance."  The Amendatory Endorsement states that "Paragraph 5 Other Insurance of Section IV – Conditions" replaces the below language:

8

**5. Other Insurance**

a. This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit'.  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those insurers.

b. When this insurance is excess over insurance, we will pay only our share of the 'ultimate net loss' that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

ECF No. 70-3 at PageID 1390.

Instead, the Amendatory Endorsement provides:

Paragraph 5 Other Insurance of Section IV – Conditions is replaced with the following:

5. **Other Insurance**

**This policy shall apply in excess of all 'underlying insurance' whether or not valid and collectible.  It shall also apply in excess of other valid and collectible insurance** (except other insurance purchased specifically to apply in excess of this insurance) which also applies to any loss for which insurance is provided by this policy.

These excess provisions apply, whether such other insurance is stated to be:
1. Primary;
2. Contributing;
3. Excess; or
4. Contingent.

ECF No. 70-3 at PageID 1377 (emphasis added).

### f. Procedural Background

Plaintiffs filed the Second Amended Complaint on February 28, 2019, adding Clay & Land as a defendant in this case. (ECF No. 70.) The Lowery Defendants filed their Answer to the Second Amended Complaint on March 14, 2019, which included additional crossclaims and counterclaims. (ECF No. 78.) On April 19, 2019, Plaintiffs filed a 12(b)(6) Motion to Dismiss Defendants' Counterclaim and Alternative Motion to Stay Claim for Bad Faith Refusal to Pay. (ECF No. 85.) On the same day, Defendant Clay & Land filed a 12(b)(1) Motion to Dismiss for Lack of Jurisdiction, arguing that all claims filed against it were not ripe for review, thereby preventing the Court from exercising jurisdiction over these claims. (ECF No. 86 at PageID 1503–04.) On January 14, 2020, this Court entered an Order Granting in Part and Denying in Part the pending Motions to Dismiss. (ECF No. 151.) In particular, the Court denied Clay & Land's 12(b)(1) motion to dismiss for lack of jurisdiction, granted Clay & Land's motion to dismiss crossclaims filed by Eagle Sales, and dismissed Eagle Sales' counterclaims against Plaintiff for being unripe for adjudication. (Id.)

On May 11, 2020, the Lowery Defendants and Plaintiffs filed cross-motions for summary judgment. (ECF Nos. 176, 177.) Clay & Land filed a response to Plaintiffs' motion on July 2, 2020. (ECF No. 186.) Eagle Sales filed responses to both motions for summary judgment on July 2, 2020. (ECF Nos. 188, 189.) The Lowery Defendants and Plaintiffs also filed responses in opposition to the cross-motions for summary judgment on July 2, 2020. (ECF Nos. 187, 190.) On July 13, 2020, the Lowery Defendants and Plaintiffs filed replies to the responses in opposition to the cross-motions for summary judgment. (ECF Nos. 191, 192.) The Lowery Defendants additionally filed a reply to Clay & Land's response to their motion for summary judgment. (ECF No. 193.)

10

A hearing on the cross-motions for summary judgment was held on December 17, 2020. (ECF No. 203.)

## II.   LEGAL STANDARD

### A.  Summary Judgment

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the non-moving party." Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." Mosholder, 679 F.3d at 448-49; see also Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587. "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 914 (6th Cir. 2013) (quoting Chapman v. UAW Local 1005, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)) (internal quotation marks omitted).

In order to "show that a fact is, or is not, genuinely disputed," a party must do so by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or showing "that an adverse party cannot produce admissible evidence to support the fact." L.R. 56.1(b)(3); Bruederle, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); see also Mosholder, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting Celotex, 477 U.S. at 325)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" Martinez, 703 F.3d at 914 (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" Pharos Capital Partners, L.P. v. Deloitte & Touche, 535 Fed. Appx. 522, 523 (6th Cir. 2013) (per curiam) (quoting Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008), abrogation recognized by Anderson v. City of Blue Ash, 798 F.3d 338 (6th Cir. 2015)).

The decisive "question is whether 'the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law.'" Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 251-52). Summary judgment "'shall be entered' against the non-moving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'" Rachells v. Cingular Wireless Employee Servs., LLC, No. 1:08CV02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990)). "[A] mere 'scintilla' of evidence in support of the non-

moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 251).  "[I]n order to withstand a motion for summary judgment, the party opposing the motion must present "affirmative evidence" to support his/her position." Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992) (citing Liberty Lobby, 477 U.S. at 247-254; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)).  "[C]onclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." Rachells, 2012 WL 3648835, at *2 (quoting Thomas v. Christ Hosp. and Med. Ctr., 328 F.3d 890, 894 (7th Cir. 2003)).  Statements contained in an affidavit that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient.  See Mitchell, 964 F.2d at 584-85.

### B.  Contract Interpretation

An insurance policy is to be interpreted as any other contract.  Am. Justice Inc. Reciprocal v. Hutchinson, 15 S.W.3d 811, 814 (Tenn. 2000).  In a diversity action involving an insurance contract, a federal court applies the substantive law of the forum state.  Talley v. State Farm Fire and Cas. Co., 223 F.3d 323, 326 (6th Cir. 2000) (internal citations omitted).  A federal court must follow the decisions of the state's highest court when that court has addressed the relevant issue. Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1181 (6th Cir. 1999).

Under Tennessee law, "[t]he question of the extent of insurance coverage is a question of law involving the interpretation of contractual language…." Clark v. Sputniks, LLC, 368 S.W.3d 431, 441 (Tenn. 2012).  "Insurance contracts are 'subject to the same rules of construction as contracts generally,' and in the absence of fraud or mistake, the contractual terms 'should be given

their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.'" <u>Id.</u> (quoting <u>U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.</u>, 277 F.W.3d 381, 386–87 (Tenn. 2009)).   "If the contractual language is clear and unambiguous, the literal meaning of the control controls the dispute." <u>West v. Shelby County Healthcare Corp.</u>, 459 S.W.3d 33, 42 (Tenn. 2014) (quoting <u>Maggart v. Almany Realtors, Inc.</u>, 259 S.W.3d 700, 704 (Tenn. 2008)).   Where the words in the contract are clear and unambiguous, the interpretation of the contract is solely a question of law leaving no genuine factual issue for a jury to decide.   <u>See Kafozi v. Windward Cove, LLC</u>, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005) ("A determination of the intention of the parties 'is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effects of the words, there is no genuine factual issue left for a jury to decide.'" (quoting <u>Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.</u>, 78 S.W.3d 885, 890 (Tenn. 2002))).

Additionally, within the realm of insurance contracts, "exclusions help define and shape the scope of coverage." <u>Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.</u>, 972 S.W.2d 1, 7 (Tenn. Ct. App. 1998).   While the insuring agreement sets the outer limits of insurer liability, exclusions operate to decrease coverage.   <u>Id.</u>   Exclusions "should not be construed broadly in favor of the insurer, nor should they be construed so narrowly as to defeat their intended purpose." <u>Id.</u> at 8.   Tennessee courts also consider the policy as a whole and construe its terms "in a reasonable and logical manner." <u>Merrimack Mut. Fire Ins. Co v. Batts</u>, 59 S.W.3d 142, 148 (Tenn. Ct. App. 2001).   "Where provisions that purport to limit insurance are ambiguous, however, they must be construed against the insurance company and in favor of the insured." <u>Osborne v. Mountain Life Ins. Co.</u>, 130 S.W.3d 769, 773 (Tenn. 2004).

## III.    ANALYSIS

### A.    Material Factual Disputes Preclude Summary Judgment on the Application of the Exclusion of Named Driver Endorsement

The parties' dispute whether the Exclusion constitutes a valid and enforceable contract under Tennessee law.  Plaintiffs seek a declaratory judgment finding that the Exclusion is a valid and enforceable contract that prevents Defendants from claiming coverage for damages stemming from Blake's accident.  (ECF No. 177-1 at PageID 3296.)  Conversely, Defendants oppose this and ask the Court to find that the Exclusion is invalid and enter summary judgment in their favor. (ECF No. 176-2 at PageID 1944.)

"In order to enforce a contract in Tennessee, the contract must result from a meeting of the minds, must be based upon sufficient consideration, and must be sufficiently definite to be enforced."  Peoples Bank of Elk Valley v. ConAgra Poultry Co., 832 S.W.2d 550, 553 (Tenn Ct. App. 1991) (internal citation omitted).  "The contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences … might reasonably be draw."  Id. (internal citations and quotations omitted).

> It is well settled that riders or endorsements qualifying or restricting the liability to the insurer attached to the face of the policy contemporaneously with its issuance to the insured, constitute a part of the policy, where such riders or endorsements themselves provide that they are a part of the policy.

Taylor v. State Farm Ins. Co., 775 S.W.2d 370, 371 (Tenn. Ct. App. 1989) (citing Brown v. Tennessee Auto Ins. Co., 237 S.W.2d 553, 554 (Tenn. 1951) (internal citation omitted)).

Here, the language of the Exclusion provides as follows:

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**EXCLUSION OF NAMED DRIVER**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
TRUCKERS COVERAGE FORM

This endorsement changes the policy effective on the inception date of the policy unless an-
other date is indicated below.

ENDORSEMENT EFFECTIVE 06/01/16                          AT 12:01 A.M. STANDARD TIME

NAMED INSURED EAGLE SALES COMPANY, INC          POLICY NUMBER AW5-A945276-00

In consideration of the premium charged, the insurance afforded by this policy does not apply
to any "accident" or "loss" resulting from the operation or use of any covered "auto" by the
individual named in the schedule of this endorsement.

**SCHEDULE**

**NAME OF INDIVIDUAL(S):**
JERMAINE HART
JAMES D DINGE
JAMES WELDON HATFIELD
WILLIAM BLAKE KOBECK

_____
Signature of Insured

_____
Date of Signature

ECF No. 70-2 at PageID 1094.

The Exclusion is clear in that it excludes Blake from the Allmerica Policy, but whether it is a
valid and enforceable contract hinges on mutual assent to the Exclusion.  "There is no enforceable
contract without mutual assent to the terms."  Sweeten v. Trade Envelopes, Inc., 938 S.W.2d 383,
386 (Tenn. 1996).  "To determine mutual assent, the intention of the parties must be examined."
Murray v. Tennessee Farmers Assur. Co., 2008 WL 3452410, at *2 (Tenn.Ct.App. Aug. 12, 2008)
(internal citation omitted).  The search for the parties' intent begins with the writing itself but also
includes the circumstances surrounding the alleged creation of the contract.  Realty Shop, Inc. v.
RR Westminster Holding, Inc., 7 S.W.3d 581, 597 (Tenn.Ct.App. 1999).

Plaintiffs argue that "as a result of the [Exclusion], the potential insurance coverage that otherwise may have been afforded by Plaintiffs' insurance Policies, is not applicable to any accident in which Blake is driving, including the subject accident presently at issue." (ECF No. 177-1 at PageID 3298.) Plaintiffs add that Defendants were aware of the exclusion and accepted the terms of the Exclusion by paying premiums on the Allmerica Policy. (ECF No. 177-1 at PageID 3298. Indeed, TENN. CODE. ANN. § 56-7-135(b) provides:

> The payment of premium for an insurance contract, or amendment thereto, by an insured shall create a rebuttable presumption that the coverage provided has been accepted by all insureds under the contract.

TENN. CODE. ANN.§ 56-7-135(b).

Here, however, Defendants have rebutted this presumption and raised additional issues of fact that, if true, would preclude applicability of the Exclusion. For example, when Blake was listed as an excluded driver for the renewal of the policy for 2017–2018, a signature was required on the Exclusion of Named Drivers Endorsement. The lack of signature on the Endorsement is not dispositive, but it is evidence of Defendants' contention that they had not assented to this portion of the policy. See Jones v. LeMoyne-Owen College, 308 S.W.3d 894 (finding that no mutual assent existed between parties where the written contract was never signed or executed). Furthermore, Defendants' arguments rests on alleged statements or assurances made by Henry to Mark Kobeck regarding the exclusion of Blake from the policy. (ECF No. 176-2 at PageID 1938.) TENN. CODE. ANN. 56-6-115(b) provides as follows:

> An insurance producer who solicits or negotiates an application for insurance shall be regarded, in any controversy arising from the application for insurance or any policy issued in connection with the application between the insured or insured's beneficiary and the insurer, as the agent of the insurer and not the insured or insured's beneficiary. This subsection (b) shall not affect the apparent authority of an agent.

Tenn. Code. Ann. 56-6-115(b)

The Tennessee Supreme Court has explained that the purpose of this statute "is to prevent the insurance company from denying responsibility for representations and actions from the agent…and to protect an applicant who relies on such representations or actions.  The statute…is thus liberally construed in the insured's favor."  Bill Brown Constr. Co., Inc. v. Glens Falls Ins. Co., 818 S.W.2d 1, 4 (Tenn. 1991) (internal citations omitted).  Therefore, an agent acting within the scope of his apparent authority, even if exceeding his authority, binds the principal.  Id. (citing Industrial Life & Health Insurance Co. v. Trinkle, 206 S.W.2d 414, 415 (1947)).  Here, the parties agree that Henry was an agent acting with apparent authority on behalf of Plaintiffs, but dispute that Henry made representations to Mark Kobeck regarding Blake's exclusion from the policy.

If true, Plaintiffs are bound by any assurance made by Henry, and they would be estopped from denying coverage.  See Allstate Ins. Co. v. Tarrant, 363 S.W.3d 508, 520 (Tenn. 2012) ("An insurance company is generally deemed estopped to deny policy liability on a matter arising out of the negligence or mistake of its agent, and if either party has to suffer from an insurance agent's mistake, it must be the insurance company."); see also Johnson & Assocs., LLC v. Hanover Ins. Grp., Inc., 572 S.W.3d 636, 645 (Tenn. Ct. App. 2018) ("Hanover is estopped from denying theft coverage for the subject property based on the representations of its agent and 'producer' BB&T. The Tennessee Supreme Court has held that an insurance company will be estopped from denying coverage by representations by the company's agent that requested coverage has or will be provided, even if there is language in the policy to the contrary."))

Here, Plaintiffs would be necessarily bound by any assurances made by Henry, which would preclude enforcement of the Exclusion, regardless of its otherwise potential validity.  Material factual disputes remain regarding any assurances provided by Henry to Mark Kobeck on Blake's exclusion from the Allmerica Policy.  The determination of whether the Exclusion is a

valid and enforceable contract relies necessarily on material issues of fact that should be determined by a jury.  Because a reasonable jury must assess the conflicting testimony from both Plaintiffs and Defendants and determine the underlying facts before this Court can rule on the validity and enforceability of the Exclusion, summary judgment is **DENIED** as to both Plaintiffs' and Defendants' motions for summary judgment on this issue.

### B.    Material Factual Disputes Exist that Preclude Finding the Subject Vehicle was not Operated by an "Insured" Driver as Defined by the Policies

Plaintiffs argue that "notwithstanding the [Exclusion], neither Blake Kobeck nor any members of the Kobeck family qualify as an 'insured' under the terms of the underlying Business Auto Policy.[4]  The Court assesses this contention under both Section II(A)(1)(b) of the Business Auto Coverage Provisions ("Coverage Provisions") and Section II(A)(1)(b)(4) of the Business Auto Broadening Endorsement ("Broadening Endorsement") of the Allmerica Policy.  Both provisions require the Court to first determine who is encompassed within the "you" to whom insurance coverage is provided.  Absent ambiguity, the Court will not rewrite or construe terms beyond the common and ordinary meaning of the policy.  See, e.g., Black v. Aetna Ins. Co., 909 S.W.2d 1, 3 (Tenn. Ct. App. 1995) ("The parties' respective rights and obligations are governed by their contract of insurance whose terms are embodied in the policy.  As with any other contract, our responsibility is to give effect to the expressed intention of the parties, by construing the policy fairly and reasonably, and by giving the policy's language its common and ordinary meaning.") (internal citations omitted).  The named insured according the Allmerica Policy is Eagle Sales, and thus the Court will interpret the provisions with "you" defined as Eagle Sales.  The Court is

---

[4] Defendants argue that this issue has been waived because it was not raised in the pleadings, but Plaintiffs explicitly relied on provisions of both the Allmerica Policy and Mass Bay Policy in the Second Amended Complaint (ECF No. 70).  Furthermore, they have brought suit under 28 U.S. Code § 2201 and the Court is tasked with interpreting the coverage provisions of the Policies, which is an appropriate use of the Court's discretion in addressing declaratory judgments.  See Northland Ins. Co. v. Stewart Title Guar. Co., 327 F.3d 448, 454 (6th Cir. 2003).

unconvinced by Defendants' argument that the Allmerica Policy should be read as "you" referring to Mark Kobeck (ECF No. 187-31 at PageID 5607), particularly since this is a commercial auto policy for Eagle Sales.

### 1.    Business Auto Coverage Provisions

Plaintiffs assert that Blake was not an "insured" under Section II(A)(1)(b) of the Business Auto Coverage Provisions.    Section II(A)(1)(b) provides coverage under the following circumstance:

> b. Anyone else while using with **your permission** a covered "auto" you **own, hire, or borrow** except:
>
> > (1)    The owner or anyone else from whom you **hire or borrow** a covered "auto".  This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.
> >
> > (2)    Your "employee" if the covered "auto" is owned by that "employee" or a **member of his or her household**.

ECF No. 70-2 at PageID 1064.

Plaintiffs argue that "[i]n order for Blake Kobeck to be classified as an 'insured' under Section II(A)(1)(b)," "(1) Eagle Sales must have owned, hired, or borrowed the Cadillac CTS-V; and 2) Blake Kobeck must have used the 2014 Cadillac CTS-V with Eagle Sales' permission." (ECF No. 177-1 at PageID 3299.)

### a)    Eagle Sales Borrowed the Cadillac

On the first portion of this analysis, it is undisputed that Mark Kobeck, not Eagle Sales, was the title owner of the Cadillac.  (ECF No. 187 ¶ 24.)  Furthermore, there appears to be no dispute that Eagle Sales does not "hire" the Cadillac.  (ECF No. 187-31 at PgaeID 5608.) However, the parties' dispute whether Eagle Sales borrowed the Cadillac.  Notably, Plaintiffs contend that "at the time of the subject accident, Blake Kobeck's use of the Cadillac CTS-V 'purely personal' and not for any business purpose of Eagle Sales" and therefore, "Eagle Sales had no

incentive to 'borrow' the vehicle from Mark Kobeck so that Blake Kobeck could use it for non-business purposes[.]"  (ECF No. 177-1 at PageID 3300.)  Plaintiffs impermissibly attempt to change the effect of the clause by changing the tense of the word.  The plain language under Section II(A)(1)(b) provides coverage for an auto you "own, hire or borrow."  (ECF No. 70-2 at PageID1064.)  The Allmerica Policy does not say that Eagle Sales needed to be *borrowing* the Cadillac at a specific moment for this provision to apply.  The question instead is—whether Eagle Sales borrows the Cadillac—to which the answer is yes.  Plaintiffs do not dispute that Eagle Sales borrows the Cadillac from Mark Kobeck, the named owner of the Cadillac; they instead focus on whether or not the vehicle was borrowed at the time of the accident.  (ECF No. 187 ¶ 61.)  Eagle Sales unquestionably borrows the Cadillac when utilizing the Cadillac for business purposes.  There is no language suggesting that the Cadillac needed to be borrowed at the time of the accident for this provision to apply.

### b)      Whether Blake had Implicit Permission to Use the Cadillac Remains a Material Factual Dispute

The second portion requires the Court to assess whether Blake had implicit or express permission to drive the Cadillac.  According to Plaintiffs, "because Eagle Sales was not the owner of the 2014 Cadillac CTS-V at issue, it could not grant anyone permission to use or borrow the vehicle."  (ECF No. 190 at PageID 5633.)  Instead, "the ability to grant Blake Kobeck permission rested with Mark Kobeck, not Eagle Sales."  (ECF No. 177-1 at PageID 3300.)  As Executive Vice-President and an officer of Eagle Sales, Mark Kobeck is an agent of Eagle Sales and had the ability to give permission to drive the Cadillac on its behalf, but the parties' dispute whether or not he did so on the night of the accident.  (ECF Nos. 187 ¶¶ 36–37.)

Permission to use an automobile can be express or implied.  Teague v. Tate, 375 S.W.2d 840 (Tenn. 1964); see also Tennessee Farmers Mut. Ins. Co. v. Dunlap, 2016 WL 425047 (Tenn.

Ct. App. Feb. 4, 2016) ("When the car is being driven by a person without the actual permission (either express or implied) of the named assured, then the driver is not an additional assured) (internal citations omitted).  Here, there appears to be no dispute that Blake did not have express or specific permission to use the Cadillac.  (ECF No. 187-31 at PageID 5608.)  The inquiry necessarily becomes whether Blake had implied permission to use the Cadillac.

Implied permission "must be the act or conduct of the named [insured].  It must amount to an intended selection of the person to operate the car.  No implied permission can arise merely because a [person] obtained possession of the car, without the knowledge of the named assured, regardless of what permission was given by other persons."    Card v. Commercial Casualty Ins. Co., 95 S.W.2d 1281, 1285 (Tenn.Ct.App. 1936).  "Implied permission does not exist where the owner of the vehicle had no knowledge of the defendant's use and could not have reasonable foreseen that use would occur."  State Farm Mut. Auto. Ins. Com. V. Dembla, 604 Fed. Appx. 484, 488 (6th Cir 2015) (Affirming the district court's finding that no reasonable factfinder could find that the driver was in lawful possession of a truck when he commandeered the vehicle to assist a friend).

Here, Mark Kobeck testified that he did not require Blake to gain permission each time he was using the car and that he generally had permission to drive it.  Blake however, testified that his dad "had no idea" that he was driving the Cadillac on the night of the accident, that he generally "did not want [him] driving it, of course", and that on the night of the accident, he "just jumped in it and drove[.]"  ("Deposition of Blake Kobeck", ECF No. 177-13 at 27:24–28:18, 59:16–61:11.) Following Blake's deposition, Mark Kobeck clarified that Blake "had permission to drive our vehicles", but that it "costs money to drive" so he "would rather him drive his own vehicle so it costs [Blake] money."  ("Nov. 2019 Deposition of Mark Kobeck", ECF No. 187-2 at 11:8–21.)  In

other words, Mark Kobeck's testimony suggests that Blake had permission to use the Cadillac on the night of the accident, while Blake's testimony suggests that he did not believe that he did.

Blake's *belief* as to whether or not he had permission, however, is not particularly relevant to the inquiry.  See State Farm Mut. Auto. Ins. Co., 604 Fed. Appx. At 488 ("But in Hafley, the Tennessee Court of Appeals held that a driver's subjective belief that he had consent to use the vehicle is irrelevant to the question of lawful possession.  The driver may only introduce evidence of objective underlying facts that could support a finding of consent." (internal citations omitted)).

Taking the facts in the light most favorable to the non-moving party, there remains a factual dispute as to whether Blake had implicit permission to drive the Cadillac on the night of the accident.  Because a reasonable jury could find that Mark Kobeck's prior conduct and statements to Blake regarding use of the vehicle could have granted implicit permission, summary judgment is **DENIED** on the issue of whether Blake was an "insured" under Section II(A)(1)(b).

### c)   Whether Blake Kobeck was a Member of the Kobeck Household Remains a Factual Dispute

Even if Blake meets the requirements under Section II(A)(1)(b) (i.e., he was driving the Cadillac with permission), the exception under Section II(A)(1)(b)(2) may apply to preclude coverage.  Tennessee courts have repeatedly held that exclusions of household members are valid and not contrary to public policy.  See, e.g., Purkey v. American Home Assur. Co., 173 S.W.3d 703, 709 (Tenn. 2005); see also VanBebber v. Roach, 252 S.W.3d 279, 285 (Tenn. 2007) (Ruling that trial court erred by instructing the jury that term "resident of your household" was ambiguous and needed to be construed against the insurance company).

The parties do not dispute that Blake has been an employee of Eagle Sales since the age of 15, including the entire year of 2017 leading up to the accident on May 9, 2017.  (ECF No. 187 ¶ 11.)  Defendants contend that "[i]t is undisputed that Blake Kobeck was not a member of Mark

23

Kobeck's household" (ECF No. 187-31 at PageID 5606), but the parties do in fact dispute this assertion (ECF Nos. 187 ¶ 11, 190-1 ¶ 23). Defendants assert that Blake Kobeck was not a member of Mark Kobeck's household. (ECF No. 190-1 ¶ 23.) They base this on Mark Kobeck's testimony, which stated that Blake "moved out probably six to eight months before the accident, and once the accident occurred, he was unable to care for himself, so he moved back in." ("August 27, 2017 Deposition of Mark Kobeck", ECF No. 176-6 at 11:6–13.) Plaintiffs interpret this as a "six to eight-month hiatus", and not a change in household. (ECF No. 190-1 ¶ 23.)

"Residence in a household contemplates both a relationship to a place and membership in a group." National Ins. Ass'n v. Simpson, 155 S.W.3d 134, 139 (Tenn. Ct. App. 2004). Tennessee recognizes "a household as a group or set of persons who dwell together as a family under the same roof." Id. "Residence in a household also requires a degree of permanence and intention to remain in the household for an indefinite period of time." Id. Courts examine whether a person is a resident of a household using a number of factors, including:

> "(1) the person's subjective or declared intent to remain in the household either permanently or for an indefinite or unlimited period of time, (2) the formality or informality of the relationship between the person and the other members of the household, (3) whether the place where the person lives is in the same house or on the same premises, (4) whether the person asserting residence in the household has another place of lodging, and (5) the age and self-sufficiency of the person alleged to be a resident of the household."

Id. (internal citations omitted).

Here, Defendants have provided proof that Blake demonstrated an intent to change his household membership (factor 1). It is, however, unclear where Blake lived and with what degree of permanence (factors 3 and 4). It is undisputed that that Blake testified that (1) he has lived at the Kobeck family residence ("1205 Cherry") his entire life (ECF No. 177-13 at 9:10–23); (2) never changed his driver's license (Id. at 11:4–6); (3) never registered to vote (Id. at 11:7–12); (4)

owned a 2003 Dodge 3500 registered at 1205 Cherry (Id. at 11:13–19); and (5) had monthly bills and bank statements sent to his parents' house at 1205 Cherry (Id. at 12:7–20).  Blake also testified, however, that for a 6 month period he lived in an apartment in Arlington, Tennessee and "rarely" went to his parents' house.  (Id. at 11:1–12:24.)  Blake further testified that he signed a one-year lease for the apartment, did not come home to spend the night at 1205 Cherry during the time he had moved out, and purchased furniture for his Arlington, Tennessee apartment.  (Id. at 13:4–14:5.)

"[T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict…on the evidence presented." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986).  A mere "scintilla of evidence" is insufficient.  Id.  Without any documentation, the Court can only examine the testimony provided by Blake, Kimberly, and Mark Kobeck.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." Anderson, 477 U.S. at 254.  Here, Plaintiffs bear the burden of proof at trial and at the summary judgment phase, facts are taken in the light most favorable to the non-moving party.  With sworn testimony, Defendants have provided more than a scintilla of evidence that a factual dispute exists on which a reasonable jury could rule.  Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge", Anderson, 477 U.S. at 255, summary judgment is **DENIED** with respect to Blake's inclusion or exclusion from the Kobeck household.

### 2.    Broadening Endorsement

Defendants contend that even if the Court concludes for summary judgment purposes that Blake was not an "insured" according to Section II(A)(1)(b) of the Business Coverage Provisions,

Hanover also sold Eagle Sales a Broadening Endorsement which would then provide a source of coverage.  (ECF No. 187-31 at PageID 5608.)  The Broadening Endorsement provides coverage to employees in the following situation:

> Any employee of yours is an 'insured' while using a covered 'auto' you do not own, hire or borrow in your business or your personal affairs.

ECF No. 70-2 at PageID 1095.

In Part III.B.1.a of this Order, the Court found that Eagle Sales can be found to *borrow* the Cadillac for business purposes.  (<u>See</u> <u>supra</u> III.B.1.a "Eagle Sales Borrows the Cadillac".)  Having already made this determination, the same analysis applies to this portion of the Allmerica Policy. The Broadening Endorsement excludes covered "autos" that are owned, hired, or borrowed by "you".  As stated earlier, "you" is the named insured (Eagle Sales), and it follows that Eagle Sales borrows the Cadillac from Mark Kobeck.  Even though Blake is an employee of Eagle Sales (ECF No. 187 ¶ 11.), the Broadening Endorsement does not extend coverage to him because it excludes a borrowed automobile—in this instance, the Cadillac.  Summary judgment is **GRANTED** on Plaintiffs' contention that the Broadening Endorsement does not extend coverage to Blake Kobeck.

### C.      The Umbrella Coverage of the Mass Bay Policy is Applicable if Blake is Not a Member of the Kobeck Household

Plaintiffs argue that Section II(3) of the Mass Bay Umbrella Coverage prevents coverage of Blake, because it states that "[a]dditional insured coverage provided by this insurance will not be broader than coverage provided by the 'underlying insurance.'"  (ECF No. 177-1 at PageID 3303.)  Plaintiffs fail to recite the entirety of this section, and do not explain why one sub-provision listed under "Additional Insured" would apply to the entirety of the umbrella coverage.  In its entirety, this section provides as follows:

> 3. Any additional insured under any policy of 'underlying insurance' will automatically be an insured under this insurance.

26

> If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by any 'underlying insurance'.
>
> Additional insured coverage provided by this insurance will not be broader than coverage provided by the 'underlying insurance.'

ECF No. 70-3 at PageID 1388.

In the Amendatory Endorsement, the Mass Bay Umbrella Coverage also provides:

5. **Other Insurance**

**This policy shall apply in excess of all 'underlying insurance' whether or not valid and collectible.  It shall also apply in excess of other valid and collectible insurance** (except other insurance purchased specifically to apply in excess of this insurance) which also applies to any loss for which insurance is provided by this policy.

These excess provisions apply, whether such other insurance is stated to be:
    1.  Primary;
    2.  Contributing;
    3.  Excess; or
    4.  Contingent.

ECF No. 70-3 at PageID 1377 (emphasis added).

It is settled that any ambiguity or contradiction in an insurance policy must be construed against the insurer, and in a manner which is more favorable to coverage.  See, e.g., Stroehmann v. Mutual Life Insurance Co. of New York, 300 U.S. 435 (1937); Mutual Life Insurance Co. of New York v. Hurni Packing Co., 263 U.S. 167, 175 (1923).  "Where provisions that purport to limit insurance are ambiguous, however, they must be construed against the insurance company and in favor of the insured."  Osborne v. Mountain Life Ins. Co., 130 S.W.3d 769, 773 (Tenn. 2004).  Here, there is one provision cited by Plaintiffs that purports to limit coverage, but should be read in the context of the section in which it is provided: "Additional Insured."  Conversely, there is an Amendatory Endorsement that appears to apply to the entire Umbrella Coverage that

27

states in no uncertain terms that the policy shall apply regardless of the coverage of underlying insurance.   The Amendatory Endorsement asserts that the Umbrella Coverage fulfills its entire reason for existing—to provide second-tier coverage for existing losses and to fill in gaps by operating as a first-tier coverage for losses not otherwise covered.   See Home-Owners Ins. Co. v. Allied Property and Casualty Ins. Co., 673 Fed.Appx. 500 fn. 1 (6th Cir. 2016).   Here, the only requirement for application of this provision is the presence of some underlying policy.

There is no dispute that the Allmerica Policy is an underlying policy for coverage of the Cadillac.  (ECF No. 187 ¶ 68.)  Plaintiffs argue that a "covered auto" can only be one to which underlying insurance applies, and that the accident does not fall within coverage and that therefore the Cadillac is not a "covered auto."  (ECF No. 177-1 at PageID 3303.)  The Court rejects these legal gymnastics.  The Cadillac is a covered automobile because it is a subject vehicle in the underlying insurance (i.e., the Allmerica Policy).  As such, coverage is not denied to Blake based on the grounds presented by Plaintiffs, provided that no other exceptions apply.

Plaintiffs also point to Section II(2)(b)(2) of the Umbrella Coverage, which excludes the following from the classification of an "insured" under the Mass Bay Policy:

2. Only with respect to liability arising out of the ownership, maintenance or use of 'covered autos':

b. Anyone else while using with your permission a 'covered auto' you own, hire or borrow is also an insured except:

(2) **Your 'employee' if the 'covered auto' is owned by that 'employee' or a member of his or her household.**

ECF No. 70-3 at PageID 1388 (emphasis added).

For the same reasons enumerated by this Court's analysis in Section III.B.1.c, Blake's membership in the Kobeck household is materially disputed.  See supra III.B.1.c.  Here, Blake qualifies as an "insured" under the Umbrella Coverage, unless the exception to coverage in Section

II(2)(b)(2) is applicable.  This question hinges on the issue of Blake's membership in the Kobeck household.  Accordingly, summary judgment is **DENIED** to both Plaintiffs and Defendants motions regarding the application of the Umbrella Coverage of the Mass Bay Policy.

### D.   There is no Evidence that Eagles Sales' Made Material Misrepresentations Such That Coverage Should be Voided

Plaintiffs argue that Defendants made material misrepresentations on their insurance application that subjected Plaintiffs to increased risk of loss, and that the "coverages afforded under the Allmerica Policy are void." (ECF No. 177-1 at PageID 3306.)  In Tennessee,

> No written or oral misrepresentation or warranty made in the negotiations of a contract or policy of insurance, or in the application for contract or policy of insurance, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless the misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increased the risk of loss.

TENN. CODE. ANN. §56-7-103.

Critically, Plaintiffs argue that the "insurance *application*" contains misrepresentations with respect to the ownership and use of the Cadillac. (ECF No. 177-1 at PageID 3304 (emphasis added).)  Plaintiffs argument fails.  Plaintiffs' evidence is not an application, it is a quote summary prepared by Hanover. (ECF No. 177-15 at PageID 3781.)  Plaintiffs conceded that this was prepared either by Hanover or one of its agents, presumably Henry at Clay & Land. (December 17, 2020 Hearing on Summary Judgment Motions, ECF No. 204.)  If this was a signed application that had been prepared by Mark Kobeck, the effect would be different, but that is not the case here.  Plaintiffs' 30(b)(6) representative, Richard Hein ("Hein") "[didn't] know who actually fills it out" or "who's responsible for putting that information in."   (172:20–173:4) Instead, this quote summary does not provide evidence of misrepresentations made by Mark Kobeck.  Plaintiffs highlight that the quote summary lists suggests that Eagle Sales is the owner of the Cadillac, and

that vehicles are not to be used by family members.  (ECF No. 177-1 at PageID 3304.)  At the same time, the quote summary explicitly lists "Vehicle Use[:] PLEASURE" for the Cadillac (ECF No. 177-15 at PageID 3782), which is consistent with Mark Kobeck's testimony that he stressed the importance of him and of his family members being able to drive the Cadillac.  (ECF No. 187 at PageID 3884.)  Because there is simply no evidence that material misrepresentations—either oral or written—were *made by Mark Kobeck* or Eagle Sales on any insurance *application*, the Court does not reach the issue of increased risk of loss.  Plaintiffs' own quote summary cannot operate as a vehicle to attribute any alleged misrepresentations to Mark Kobeck.  Summary judgment is **DENIED** and the Court finds that coverage under the Policies cannot be voided on this basis.

### E.    Plaintiffs Have a Duty to Defend

Plaintiffs contend that they have no duty to defend under both the Allmerica and Mass Bay Policies.  (ECF No. 177-1 at PageID 3306.)  "Issues regarding an insurer's duty to defend are matters of law and may be resolved by summary judgment when there are no genuine issues as to any material fact."  Standard Fire Ins. Co. v. Chester-O'Donley & Assocs., Inc., 972 S.W.2d 1, 6 (Tenn. Ct. App. 1998).  "[W]hether a duty to defend arises depends solely on the allegations contained in the underlying complaint.  St. Paul Fire & Marine Ins. Co. v. Torpoco, 879 S.W.2d 831, 835 (Tenn. 1994) (internal citation omitted).  "Accordingly, the insurer has a duty to defend when the underlying complaint alleges damages that are within the risk covered by the insurance contract and for which there is a potential basis for recovery.  Travelers Indem. Co. of Am. v. Moore & Assocs., Inc., 216 S.W.3d 302, 305 (Tenn. 2007) (internal citations omitted).

Here, the underlying tort complaint alleges claims against Eagle Sales, Mark Kobeck, Blake Kobeck, Carolyn Kobeck, and Kimberly Kobeck.  (ECF No. 177-18.)  Section II(A) of the Business Auto Policy provides:

> We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'.

ECF No. 70-2 at PageID 1064.

Section I(A)(1)(a) of the Umbrella Coverage of the Mass Bay Policy provides a similar, but broader applicability of the duty to defend:

> We shall have the right and duty to defend the insured against any 'suit ' seeking damages for such 'bodily injury' or 'property damage' when the 'underlying insurance' does not provide coverage or the limits of 'underlying insurance' have been exhausted.

ECF No. 70-3 at PageID 1379.

Plaintiffs do not allege that Eagle Sales is not a named insured, but they do argue that Blake, Mark, Kimberly and Carolyn do not qualify as "insureds" under either of the Policies.

### 1.     Carolyn and Kimberly Kobeck are Insureds

Consistent with the Court's findings in this Order, Carolyn and Kimberly Kobeck qualify as "insureds" under both Policies.  Both Policies allow for the following to be an insured: "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow[.]" ECF No. 70-2 at PageID 1064.  Here, both Carolyn and Kimberly are people that Mark Kobeck can provide permission to drive the Cadillac.  None of the five exceptions listed under Section II(A)(1)(b) are applicable to either Kimberly or Carolyn Kobeck, neither of whom are employee,

partners or otherwise have any involvement with Eagle Sales.[5]  Summary judgment is **DENIED** to Plaintiffs.  Plaintiffs have a duty to defend Carolyn and Kimberly Kobeck.

### 2.   Whether Blake is an Insured Depends on Jury's Finding Regarding the Household Issue

As discussed previously in this Order, whether Blake is an "insured" under either the Allmerica or Mass Bay Policy hinges on his membership in the Kobeck household.  If Blake was *not* a member of the household at the time of the accident, then he qualifies as an "insured" under Section II(A)(1)(b) of the Allmerica Policy and section II(2)(b)(2) of the Mass Bay Umbrella Policy.  See supra III.B.1.c, III.C.  As such, summary judgment is **DENIED** to Plaintiffs' on their duty to defend Blake Kobeck because a reasonable jury could find that Blake was not a member of Kobeck household, which in turn makes him an "insured" for the purposes of both policies.

### 3.   Mark Kobeck is an Insured at least to the Extent of his Liability

Because Eagle Sales is the named insured under both Policies, Mark Kobeck does not have personal coverage under the Policies.  Mark Kobeck is the title owner of the vehicle, and Section II(2)(b)(1) prevents "[t]he owner or anyone else from whom [Eagle Sales] hire[s] or borrow[s] a 'covered auto'" from being insured.  (ECF No. 70-3 at PageID 1388.)  Where there is no ambiguity, the Court will not rewrite or construe terms beyond the common and ordinary meaning of the policy.  See, e.g., Black v. Aetna Ins. Co., 909 S.W.2d 1, 3 (Tenn. Ct. App. 1995) ("The parties' respective rights and obligations are governed by their contract of insurance whose terms are embodied in the policy.  As with any other contract, our responsibility is to give effect to the expressed intention of the parties, by construing the policy fairly and reasonably, and by giving the policy's language its common and ordinary meaning.") (internal citations omitted).  Here, the

---

[5] Note that in the underlying State Tort Complaint, Lowery Defendants allege that Carolyn Kobeck was at least partially an owner of Eagle Sales.  (ECF No. 177-18 at PageID 3808.)

result is that for liability arising out of ownership, maintenance, or use of the Cadillac, Mark Kobeck's personal use does not qualify him as an "insured".

Mark Kobeck is however, covered under Section II(2)(c) of the Mass Bay Umbrella Policy, which provides that with respect to liability arising out of the ownership, maintenance or use of "covered autos", "[a]nyone liable for the conduct of an insured described above is also an insured, but only to the extent of that liability." (ECF No. 77-3 at PageID 1388.)  As the principal officer of Eagle Sales, it is foreseeable that Mark Kobeck can be held liable for the conduct of an insured, and thus he qualifies as an "insured" under this section.  Accordingly, Plaintiffs have a duty to defend Mark Kobeck at least to the extent of his liability in accordance with this section.  Summary judgment for the Plaintiffs is **DENIED**.

### 4.      Plaintiffs have a Duty to Defend Against Claims of Negligent Entrustment

Plaintiffs assert that they have no duty to defend against claims of negligent entrustment because Section II(B)(1)(g) of the Business Coverage Provisions excludes claims for negligent entrustment from applicability.  (ECF No. 177-1 at PageID 3308.)  Plaintiffs' citation is misplaced. The relevant portion is the Umbrella Coverage in the Mass Bay Policy, which places a duty to defend on Plaintiffs for "any 'suit' seeking damages for such 'bodily injury' or 'property damage' when the 'underlying insurance' does not provide coverage or the limits of 'underlying insurance' have been exhausted."  (ECF No. 70-3 at PageID1379.)  Accordingly, summary judgment is **DENIED** to Plaintiffs.  Plaintiffs have a duty to defend against claims of negligent entrustment.

### 5.      The Duty to Defend Applies to Loss of Consortium Damages

Finally, Plaintiffs allege that the "underlying tort complaint also alleges a spousal loss of consortium", which is not damage due to "bodily injury" or "property damage."  (ECF No. 177-1 at PageID 3308.)   Plaintiffs do not cite to any case law to support this contention.  Conversely,

Defendants highlight that in Tennessee, where the provisions "do not establish whether consortium was intended to be excluded or excluded", the "policy provisions are ambiguous and ambiguities must be construed against the insurance company and in favor of the insured." Harper v. Kelley, 1991 WL 220611, at *2 (Tenn. Ct. App. Oct. 31, 1991) (citing Palmer v. State Farm Mut. Auto. Ins. Co., 614 S.W.2d 788 (Tenn. 1981)). Here, where "bodily injury" does not clearly exclude loss of consortium claims that may stem from it, the Court construes it to be in the light most favorable to non-moving party. Accordingly, summary judgment is **DENIED** on this point.

### F. The Duty to Indemnify is not Ripe for Adjudication

Plaintiffs argue that "[t]o the extent that an employee or agent of Clay & Land, acting in the course and scope of their employment, exceeded their authority and represented to Mark Kobeck that insurance coverage existed for Blake Kobeck…such unauthorized assurance would be in direct conflict with the plain terms of the Policies" and "Clay & Land would be liable to Plaintiffs for any resulting liability, damages, or loss." (ECF No. 177-1 at PageID 3310.) Defendant Clay & Land maintains that the "issue of ripeness" is "unresolved, and Clay & Land again raises the defense that Hanover's claim for indemnification is improper until the underlying tort litigation has been resolved thus making Hanover liable to the Lowerys." (ECF No. 186 at PageID 3845.)

"An insured's duty to indemnify is dependent on the outcome of the case. Before the case is resolved, declaratory relief as to indemnity is premature." Topmost Chemical and Paper Corp. v. Nationwide Ins. Co., No. 01–2588V, 2002 WL 1477880, at *7 (W.D. Tenn. Apr. 23, 2002). The Sixth Circuit recently provided a two-step test to assess whether a duty to indemnify is ripe. Jackson v. City of Cleveland, 925 F.3d 793 (6th Cir. 2019). The Sixth Circuit states that "courts should determine (1) whether a matter is appropriate for judicial resolution and (2) whether the

parties would undergo hardship if judicial relief is denied on their claim before it ripens further."

Id. at 808 (internal quotations omitted).  The Sixth Circuit explains:

> "Generally, a claim may not be adjudicated on its merits until it is ripe.  A claim is unripe when it is anchored in future events that may not occur as anticipated, or at all.… The ripeness doctrine exists to prevent courts, through premature adjudication, from entangling themselves in abstract disagreements.  Application of this doctrine requires that the court exercise its jurisdiction to determine if judicial resolution would be desirable under all of the circumstances.… Indemnification claims are frequently brought while unripe, depending as they often do on the favorable adjudication of underlying tort claims.  Because of this, as a general matter, a claim for indemnification for damages that may be awarded on an underlying tort claim should not be adjudicated on the merits until the underlying tort claim is adjudicated."

Id. at 807–08 (internal citations and quotations omitted).

Here, the jury's factual findings with respect to Henry's alleged assurances to Mark Kobeck will necessarily dictate whether or not an inquiry on indemnification is necessary.  Furthermore, Defendants have other paths to obtain coverage under the Mass Bay Policy that do not involve any questions of indemnification from Clay & Land.  Accordingly, the issue of indemnity with respect to any potential assurances made by Henry on behalf of Clay & Land remain unripe until this litigation and the underlying tort litigation have been resolved.  Summary judgment with regards to indemnification by Clay & Land to Plaintiffs is **DENIED AS UNRIPE**.

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs' and Defendants' motions for summary judgment are both **GRANTED IN PART** and **DENIED IN PART**.

/s/ Jon P. McCalla_____
JON P. McCALLA
UNITED STATES DISTRICT COURT

35